ROBERT J. ROSATI, SBN 112006
robert@erisalg.com
RAQUEL M. BUSANI, SBN: 323162
raquel@erisalg.com
6485 N. Palm Avenue, Suite 105
Fresno, California 93704
Telephone: 559-478-4119
Telefax: 559-478-5939

Attorneys for Plaintiff,
MICHEL BENNETT

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| MICHEL BENNETT,<br><br>  Plaintiff,<br><br>v.<br><br>THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA,<br><br>  Defendant. | CASE NO.<br><br>**COMPLAINT**<br><br>**FOR DECLARATORY AND EQUITABLE RELIEF FOR LONG TERM DISABILITY BENEFITS UNDER 29 U.S.C. SECTION 1132(a)(1) and (3)** |

Plaintiff, Michel Bennett ("Plaintiff" or "Bennett") alleges as follows:

**JURISDICTION**

1.  Plaintiff's claims for relief arise under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. section 1132(a)(1) and (3). Pursuant to 29 U.S.C. section 1331, this court has jurisdiction over this action because this action arises under the laws of the United States of America. 29 U.S.C. section 1132(e)(1) provides for federal district court jurisdiction of this action.

**VENUE**

2.  Venue is proper in the Eastern District of California because Plaintiff was and is a resident of the City of Bakersfield, in the County of Kern, California, when Defendant terminated her long term disability benefits and denied her appeal of that decision. Therefore, 29 U.S.C.

section 1132(e)(2) provides for venue in this Court. Intradistrict venue is proper in this Court's Fresno Division.

## PARTIES

3. Plaintiff is, and at all times relevant hereto was, a participant, as that term is defined by 29 U.S.C. section 1000(7), of the Diversified Project Services International, Inc. Long Term Disability Plan ("The Plan") and thereby entitled to receive benefits therefrom. Plaintiff was a beneficiary because she was an employee of Diversified Services International, Inc., which established The Plan for the benefit of its members.

4. The Plan is an employee welfare benefit plan organized and operating under the provisions of ERISA, 29 U.S.C. section 1001 et seq.

5. Defendant Guardian Life Insurance Company of America, ("Guardian"), issued Group Plan No. G-00485535-IC ("The Policy") to the Trustees of the Business and Management Services Industry Trust. Bennett's employer, Diversified Project Services, International, Inc., is a participating employer of the Trust under which benefits are provided by The Plan, is the insurer and decision maker for The Plan, acted in a fiduciary capacity when it terminated Bennett's benefits and denied her appeal, is legally liable for providing the benefits sought and for the fiduciary breaches at issue herein.

## FIRST CLAIM FOR RELIEF

6. The Policy provides long term disability ("LTD") benefits, which benefits potentially could continue until the claimant is 65 years of age.

7. The Policy provides, in part:

    A.    Total Disability or Totally Disabled means,

> "that as a result of sickness or m1ury, during the elimination period and the own occupation period, a covered person is not able to perform with reasonable continuity the substantial and material acts necessary to pursue his or her usual occupation and the covered person is not working in his or her usual occupation. After the end of the own occupation period, total disability or totally disabled means that as a result of sickness or injury a covered person is not able to engage with reasonable continuity in any occupation in which he or she could reasonably be expected to perform satisfactorily in light of his or her age, education, training, experience, station in life, and physical and mental capacity, that

COMPLAINT
-2-

exists within any of the following locations: (i) a reasonable distance or travel time from his or her residence in light of the commuting practices of his or her community; or (ii) a distance or travel time equivalent to the distance or travel time the covered person traveled to work before becoming disabled; or (iii) the regional labor market, if he or she resides or resided prior to becoming disabled in a metropolitan area."

B.   Substantial and material acts means,

"the important tasks, functions and operations generally required by employers from those engaged in his or her usual occupation that cannot be reasonably omitted or modified. In determining what substantial and material acts are necessary to pursue the covered person's usual occupation, we will first look at the specific duties required by the employer or job. If the covered person is unable to perform one or more of these duties with reasonable continuity, we will then determine whether those duties are customarily required of other persons engaged in the covered person's usual occupation. If any specific, material duties required of the covered person by the employer or job differ from the material duties customarily required of other persons engaged in the covered person's usual occupation, then we will
not consider those duties in determining what substantial and material acts are necessary to pursue the covered person's usual occupation."

C.   Usual occupation may be interpreted to mean,

"the employment, business, trade or profession that involves the substantial and material acts of the occupation the covered person was regularly performing for the employer when the disability began. Usual occupation is not necessarily to the specific job the covered person performed for the employer."

Own Occupation or Usual Occupation means the occupation:

"(a) the covered person is routinely performing immediately prior to disability; (b) which is the covered person's primary source of income prior to disability; and (c) for which he or she is insured under this plan. Occupation includes any employment, business, trade or profession that involves the substantial and material acts of the occupation the covered person was regularly performing for the employer when the disability began. Own occupation or usual occupation is not necessarily limited to the specific job the covered person performed for the employer."

8.   Bennett became disabled effective March 1, 2019, when she had a stroke.

9.   Bennett was admitted to the Bakersfield Heart Hospital on March 1, 2019, complaining of left-sided weakness with ataxic gait and difficulty writing.

10. On March 1, 2019, Bennett had an MRI of her brain without contrast at the Bakersfield Heart Hospital. The findings were:

- No intercranial hemorrhage
- No mass lesion.
- Positive acute infarct.

The impression was "positive acute infarction of the right mid-brain."

11. Bennett was discharged and sent home on Saturday, March 2, 2022.

12. On Sunday, March 3, 2019, Bennett had a panic/anxiety attach in which she thought she was having another stroke. She was taken by ambulance back to Bakersfield Heart Hospital.

13. Bennett had a second MRI of her brain with and without contrast at the Bakersfield Heart Hospital. That report states, in part:

   A. "There is an 11 mm focus of restricted diffusion just to the right of the midline involving the midbrain. Gradient echo images demonstrate no hemorrhage. The findings are consistent with an acute non-hemorrhagic infarct of the brainstem. . . .11 mm acute non-hemorrhagic infarct to the right of the midline involving midbrain."

14. Bennett was discharged from Bakersfield Heart Hospital on March 3, 2019, with discharge diagnoses of:

- Acute ischemic infarct of the right midbrain.
- Left eye conjunctivitis
- History of Hypertension

"MRI of the brain showed acute ischemic infarct of the right mid-brain."

15. Bennett timely submitted a claim for LTD benefits to Guardian.

16. By letter dated August 14, 2019, Guardian denied Bennett's claim for LTD benefits, asserting Bennett was not a covered employee.

17. By letter dated September 6, 2019, Guardian wrote Bennett that upon reconsideration it determined that she was a covered employee.

18. By letter dated November 15, 2019, Guardian notified Bennett that her claim for

LTD benefits had been approved and that potentially she could qualify for payments through September 16, 2034, providing all policy provisions were met.

19. Guardian submitted a "Vision Impairment Questionnaire" to Bennett's Optometrist. On February 17, 2020, Penelope S. Suter, O.D., F.C.O.V.D., responded, explaining in part, that:

A. Bennett has functional limitation regarding: (i) Depth perception, "markedly reduced RD vision secondary to poor eye coordination;" (ii) Eye-hand coordination: "eyes do not coordinate with each other for five eye-hand tasks; (iii) Clerical perception: "eyes do not coordinate leading to strain & misreads;" Other: "spatial perception affects balance."

B. Dr. Suter wrote that given Bennett's visual limitations, she was not capable of returning to her own job because she cannot perform extended computer work, extended paperwork.

C. To return to work, Bennett would need accommodations of no more than 60 minutes of computer work per 2-hour work period and frequent breaks for 10 minutes from desk work throughout the day.

20. On August 18, 2020, Bennett reported to Dr. Birdi that she had been having neck pain that is sharp and shooting, tingling in her arms and hands, intermittent swelling in her arms and hands on a daily basis and that when she drives, she forgets where she is going or how she got there. The assessments were confusion, degenerative disc disease, history of cerebral vascular accident (CVA), and arm swelling.

21. Dr. Erik Frempong provided a Physical Capabilities Evaluation concerning Bennett on December 28, 2020, to Guardian. He indicated therein that Bennett cannot work in heights, cannot operate heavy machinery, cannot maintain balance: "dizzy;" cannot be exposed to vibration: headache; cannot operate computers/office devices: difficulty with keyboard/headache from computer screen; and cannot be exposed to dust, fumes, gases or chemicals: headaches. He explained that she has a history of cerebral vascular accident (stroke) with long-term residual deficits. He stated no return to work at this time but would reevaluate in a year; his objective

medical reasoning for his restrictions were, "Risk of fall and injury. Physical limitation as a result of suffering stroke."

22. Guardian obtained a records review by its Nurse Case Manager, Mary Sheplock, RN, on March 23, 2021. She noted a history of CVA/stroke, carpal tunnel syndrome, migraines, and other conditions, and reports of forgetfulness, confusion, forgetting while driving.

23. Guardian obtained an in-house Behavioral Health Case Manager review by Leslie Reiter, PhD., on April 16, 2021. Reiter opined that Bennett's psychiatric condition "do not support a significant level of phsych(ological) funct(ional) impairment or [symptoms] severity [level] that would prevent [Employee] from [Returning to work].

24. By letter dated May 11, 2021, with one month remaining of potential "own occupation" benefits, Guardian terminated Bennett's LTD benefits but invited Bennett to appeal."

25. Bennett submitted a timely appeal of the termination of her LTD benefits, which Guardian received on July 1, 2021. Guardian's appeal team spoke with Bennett and Bennett agreed to defer the initiation of her appeal until Guardian's appeal team received updated medical records from all of her treating physicians.

26. As part of its appeal review Bennett's file was referred to an in-house Nurse Case Manager for a medical assessment. Carrie Friedman, RN completed an initial review dated September 13, 2021, noting "Benefit paid through 4/29/2021," change in definition (of disability): 5/30/2021"; and summarized various medical records.

27. As part of the internal appeal review, Bennett's file was also referred to a Vocational Rehabilitation Specialist for vocational assessment.

28. By letter dated October 20, 2021, apparently fax November 9, 2021, Guardian's CarrieAnn Friedman, RN, Appeals Nurse Case Manager, wrote one of Bennett's treating physicians, Dr. Henry Chien, asking specific questions.

29. On November 19, 2021, Dr. Chien responded to Friednman's letter: He wrote that Bennett has "Ataxia with left side weakness resulting in abnormalities in balance and gait, which directly contribute to multiple falls. Bilateral dysmetria results in problems with coordination, especially with hands, fingers and feet. Therefore, [Bennett] is unable to ambulate safely and

unable to adequately accomplish tasks that require coordination of body, fine motor control, ambulation, and strength of extremities." "There is no anticipated improvement as the post-stroke window of improvement is long gone." Dr. Chien also completed on November 19, 2021, the CVA evaluation form submitted to him by the Guardian. In that form, he explained that Bennett has residual paresis in her left arm and left leg. She has difficulty with walking, ataxia/muscle coordination, balance, dysphagia, vision, speech/aphasia, pain, and paresthesia (pins and needles sensation). She has short-term memory loss, attention deficit, planning, apraxia and decision-making difficulties, and difficulties with her ability to order new tasks. He noted no improvement is expected and a return to work is not feasible for Bennett.

30. Guardian then requested and obtained a Peer Review Report, dated December 16, 2021, by Dr. Michelle Boudreau, D. O., Board Certified in Neurology and Psychiatry. According to her report, Dr. Boudreau was not provided with any records: concerning Bennett's hospitalization for stroke; or concerning Bennett's MRIs; or any records from Bennett's cardiologist.

    A. Based on the limited and incomplete records Dr. Boudreau was provided, she concluded that "there is some clinical evidence to support . . . but not enough to confirm the diagnosis" of stroke, explaining "no brain MRI report is provided in the records. Because many conditions can mimic stroke and can causes symptoms similar to a stroke, there is not enough evidence to support the presence of a stroke without the results of the brain MRI."

    B. Dr. Boudreau did note that there is clinical evidence to support the presence of right carpal tunnel syndrome, migraines, and there are reported vision changes/double vision and cognitive difficulties but "whether the medical records support the presence of these diagnoses would be best answered by an appropriate specialist."

    C. Dr. Boudreau also recommended "because exams by an ophthalmologist can detect subtle abnormalities and eye movements that bedside exams cannot, whether Ms. Bennett has diplopia or vision changes would be best be answered by the appropriate specialist.

   D. Dr. Boudreau also opined, "Whether there is clinical evidence to support any non-neurological condition would best be answered by the appropriate specialist."

   E. Based on the limited, incomplete, and misleading records with which she was provided, Dr. Boudreau concluded that Bennett had limitations concerning lifting, carrying, pushing and pulling, bending, climbing stairs, balancing, stooping and crouching, kneeling and crawling, exposure to unprotected heights, uneven or slippery surfaces, bodies of water, electrical hazards, sharp objects or moving mechanical parts, and other restrictions related to her migraines - - she should avoid bright lights, fluorescent lights, and loud noises when she has a headache.

   F. Dr. Boudreau concluded that "because her stroke occurred in March 2019, I would not anticipate any additional improvement in a functionality due to her stroke because improvement from strokes typically plateaus after one year."

   G. Dr. Boudreau disagreed with Dr. Chien's restrictions and limitations, as set forth in his November 19, 2021, reports.

31. Guardian's Vocational Rehabilitation Specialist reviewed Dr. Boudreau's Peer Report and opined that there were no restrictions placed for sitting, standing, or walking and there were only a few safety-related walking notations and no restrictions placed on Bennett's ability to use her bilateral hands or fingers.

32. Guardian did not follow up with any of the types of specialists Dr. Boudreau recommended.

33. Guardian invited Bennett to respond to Dr. Boudreau's and the Vocational Rehabilitation Specialist's comments. Bennett did so by email dated December 20, 2021.

34. By letter dated January 14, 2022, Guardian denied Bennett's appeal, concluding in part:

   A. The letter explained in part, "Dr. Boudreau opined that there were multiple inconsistencies in the records regarding the symptoms and exam findings but there was some clinical evidence to support a stroke, but not enough to confirm the diagnosis as there was no brain MRI provided in the records."

   B. That Bennett would have been capable of performing her own occupation on a full-time basis as of October 1, 2020, even though Guardian paid LTD benefits to Bennett through April 29, 2021.

   C. That "in order to continue to receive payments, objective medical information, and objective proof of your inability to perform the duties of your own occupation, including all restrictions and limitations relating to your inability to work, must be submitted to Guardian."

   D. "However, there was objective evidence to support your disability from a physical, mental or nervous standpoint as of October 1, 2020. . . ."

   E. Guardian acknowledged that "all administrative remedies have been exhausted."

   F. Finally, the letter also states "Guardian will not seek discretionary review in court for any claim where a discretionary clause is banned by law or regulation. Guardian has not relied upon any internal rule, guideline or protocol in relation to the review and determination of your claim for benefits."

35. Review of this claim is *de novo* because discretionary clauses are banned in California by California Insurance Code §11010.6.

36. Bennett performed all conditions precedent required to be performed by her under the terms of The Policy, including but not limited to:

   A. She is and was eligible for benefits.

   B. She was disabled throughout the Elimination Period.

   C. She submitted "proof" as required by The Policy in a timely fashion.

   D. She applied for applicable "Other Income" benefits.

37. ERISA section 503, 29 U.S.C. section 1133 provides:

"In accordance with regulations of the Secretary, every employee benefit plan shall–

   (1) provide adequate notice in writing to any participant,

beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reason for such denial, written in a manner calculated to be understood by the participant, and

(2)   afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim."

38.   Defendant was required to provide Plaintiff a full and fair review of her claim for benefits pursuant to 29 U.S.C. §1133 and its implementing Regulations. Specifically:

A.   29 U.S.C. §1133 mandates that, in accordance with the Regulations of the Secretary of Labor, every employee benefit plan, including defendant herein, shall provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant and afforded a reasonable opportunity to any participant whose claim for benefits has been denied a full and fair review by an appropriate named fiduciary of the decision denying the claim.

B.   The Secretary of Labor has adopted Regulations to implement the requirements of 29 U.S.C. §1133. These Regulations are set forth in 29 C.F.R. §2560.503-1 and provide, as relevant here, that employee benefit plans, shall establish and maintain reasonable procedures governing the filing of benefit claims, notifications of benefit determinations, and appeal of adverse benefit determinations and that such procedures shall be deemed reasonable only if:

i.   Such procedures comply with the specifications of the Regulations.

ii.   The claims procedures contain administrative processes and safeguards designed to ensure and to verify that benefit determinations are made in accordance with governing plan documents and that, where appropriate, the plan provisions have been applied consistently with respect to similarly situated claimants.

iii.   Written notice is given regarding an adverse determination (i.e., denial or termination of benefits) which includes: the specific reason or reasons

for the adverse determination; with reference to the specific plan provisions on which the determination is based; a description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; a description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of ERISA following a denial on review; if an internal rule, guideline, protocol, or similar criterion was relied upon in making the adverse determination, either the specific rule, guideline, protocol, or other similar criterion or a statement that such a rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination and that a copy of such rule, guideline, protocol, or other criterion will be provided free of charge to the claimant upon request.

   iv.  The Regulations further provide: "In the case of a plan providing disability benefits, the plan must ensure that all claims and appeals for disability benefits are adjudicated in a manner designed to ensure the independence and impartiality of the persons involved in making the decision. Accordingly, decisions regarding hiring, compensation, termination, promotion, or other similar matters with respect to any individual (such as a claims adjudicator or medical or vocational expert) must not be made based upon the likelihood that the individual will support the denial of benefits."

   v.  Defendant is required to provide a full and fair review of any adverse determination which includes:

   a.  That a claimant shall be provided, upon request and free of charge, reasonable access to and copies of all documents, records, and other information relevant to the claimant's claim for benefits.

   b.  A document, record, or other information shall be considered "relevant" to a claimant's claim if such document, record, or other information: (1) was relied upon in making the benefit

determination; (2) was submitted, considered, or generated in the course of making the benefit determination, without regard to whether such document, record, or other information was relied upon in making the benefit determination; (3) demonstrates compliance with the administrative processes and safeguards required pursuant to the Regulations in making the benefit determination; or (4) constitutes a statement of policy or guidance with respect to the plan concerning the denied benefit without regard to whether such statement was relied upon in making the benefit determination.

  c. The Regulations further provide that for a review that takes into account all comments, documents, records and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination;

  d. The Regulations further provide that, in deciding an appeal of any adverse determination that is based in whole or in part on a medical judgment that the appropriate named fiduciary shall consult with a healthcare professional who has appropriate training and experience in the field of medicine involved in the medical judgment.

  e. The Regulations further require a review that does not afford deference to the initial adverse benefit determination and that is conducted by an appropriate named fiduciary of the plan who is neither the individual who made the adverse benefit determination that is the subject of the appeal nor the subordinate of such individual.

  f. The Regulations further provide that a healthcare professional engaged for the purposes of a consultation for an appeal of an adverse determination shall be an individual who is neither the individual who was consulted in connection adverse benefit determination which was

the subject of the appeal nor the subordinate of any such individual.

    g. The Regulations further provide that before a plan can issue an adverse benefit determination on review of a disability benefit claim, the plan administrator shall provide the claimant, free of charge, with any new or additional evidence considered, relied upon, or generated by the plan, insurer, or other person making the benefit determination in connection with the claim as soon as possible and sufficiently in advance of the date on which the notice of adverse benefit determination on review is required to be provided to give the claimant a reasonable opportunity to respond prior to that date.

    h. The Regulations further require that such adverse decision include discussion of the decision, including an explanation of the basis for disagreeing with or not following:

     * The views presented by the claimant to the plan of health care professionals treating the claimant and vocational professionals who evaluated the claimant;

     * The views of medical or vocational experts whose advice was obtained on behalf of the plan in connection with a claimant's adverse benefit determination, without regard to whether the advice was relied upon in making the benefit determination; and

     * A disability determination regarding the claimant presented by the claimant to the plan made by the Social Security Administration.

39. Guardian denied Bennett a full and fair review of her claim for benefits.

  A. Bennett is informed and believes that Guardian does not have claims procedures which contain administrative processes and safeguards designed to ensure and to verify that benefit determinations are made in accordance with governing plan documents and that, where appropriate, the plan provisions had been applied consistently

with respect to similarly situated claimants because when terminating Bennett's LTD benefits and denying her appeal of that termination, Guardian did not apply the terms set forth in The Policy to Bennett's claim and relied upon Dr. Boudreau's peer revie report, which Guardian knew to be not reliable, not credible, and not supported by the facts.

B.  Bennett is informed and believes and thereon alleges that Guardian knowingly and intentionally provided limited, incomplete, and misleading information concerning Bennett's medical treatment to Dr. Boudreau in order to obtain a one-sided report to justify its termination of Bennett's benefits.  In the course of its investigation of Bennett's claim, Guardian did in fact, obtain: (i) records of Bennett's hospitalization at the Bakersfield Heart Hospital; (ii) records of Bennett's two MRIs on March 1, 2019, and March 3, 2019, which confirmed that she had suffered a stroke; (iii) records from Bennett's cardiologist, which analyzed the cause of her stroke; and (iv) other records concerning Bennett's disability, which Guardian did <u>not</u> provide to Dr. Boudreau.

C.  Guardian did not investigate Bennett's disabling vision issues or her disabling cognitive issues, as recommended by Dr. Boudreau.

D.  Bennett is informed and believes based on the foregoing facts that Guardian knew that Dr. Boudreau's opinions and conclusions in her December 16, 2021, report were unreliable, invalid, and contrary to the known facts.  Nonetheless, in its January 14, 2022, appeal denial letter, Guardian explicitly relied upon Dr. Boudreau's report and opinions to continue to deny Bennett's LTD benefits.

E.  Bennett is informed and believes and thereon alleges that based on the foregoing facts that Guardian intentionally withheld specific medical records in its possession from Dr. Boudreau in order to have Dr. Boudreau to provide a report supporting the termination of Bennett's LTD benefits.

F.  Bennett is informed and believes that IF Dr. Boudreau had been provided the information Guardian possessed about the type, nature and location of Bennett's stroke and the early treatment and evaluations she received for her stroke, Dr. Boudreau would have understood that Bennett's ongoing symptomology, including deficits in

motor and balance control, dysmetria, ataxia, and cognitive and vision impairments are known and common consequences of Bennett's type/nature and location of stroke and that, as is common for Bennett's type/nature/location of stroke, Bennett's symptoms are more severe than examination findings, and that Bennett's condition makes her unable to do her own and/or any occupation and thus, disabled under The Policy.

40. Guardian's termination of Plaintiff's LTD benefits was arbitrary and capricious, an abuse of discretion, not supported by substantial evidence, and a violation of the terms of The Policy:

    A. Defendant did not provide Bennett a full and fair review of her claim for benefits and violated applicable claims Regulations.

    B. The evidence demonstrates that Bennett is, and all relevant times has been, disabled under the terms of The Policy and therefore entitled to continued LTD benefits from Guardian.

    C. Bennett is and was suffering from an illness as that term is defined by The Policy.

    D. Bennett did not work and earned no money during the relevant period.

    E. Instead, Guardian's employees provided incomplete and misleading information to, and posed questions to and obtained answers from Dr. Boudreau concerning issues and standards inconsistent with and contrary to the requirements of The Policy.

41. Bennett has exhausted all internal remedies required by the terms of The Policy and by the terms of ERISA.

42. An actual controversy has arisen and now exists between Plaintiff and Defendant with respect to whether Plaintiff is entitled to LTD benefits under The Policy.

43. Plaintiff desires a judicial determination of her rights and a declaration as to which party's contention is correct, together with a declaration that Defendant is obligated to pay her LTD benefits under The Policy, retroactive to the first day her benefits were terminated, for as long as she is entitled to receive LTD benefits under the terms of The Policy.

44. A judicial determination of these issues is necessary and appropriate this time under the circumstances described herein in order that the parties may ascertain their respective rights and duties, avoid a multiplicity of actions between the parties and their privities, and promote judicial efficiency.

45. As a proximate result of Defendant's wrongful conduct as alleged herein, Plaintiff was required to obtain the services of counsel to obtain the benefits to which he is entitled under the terms of The Policy. Pursuant to 29 U.S.C. section 1132(g)(1), Plaintiff requests an award of attorney's fees and expenses as compensation for costs and legal fees incurred to pursue Plaintiff's rights.

## SECOND CLAIM FOR RELIEF

(For Declaratory Relief or Other Appropriate Equitable Relief)

46. Plaintiff incorporates by reference paragraphs 1 through 43, inclusive, of this Complaint.

47. 29 U.S.C. §1132(a)(3) authorizes a participant or beneficiary of an ERISA plan, such as Bennett, to bring a civil action to enjoin any act or practice which violates any provision of subchapter 1, 29 U.S.C. §§1001 – 1191, or the terms of the plan, or to obtain other appropriate equitable relief to address such violations or to enforce any provisions of subchapter 1 or the terms of the plan.

48. Guardian acted in a fiduciary capacity when it investigated and decided to terminate Bennett's LTD benefits and when it investigated and decided to deny Bennett's appeal of that termination.

49. As a fiduciary, Guardian was obligated to discharge its duties with respect to The Plan solely in the interest of its participants and their beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and to defray reasonable expenses of administrating the plan; to do so with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; and to do so in accordance with the documents and instruments regarding the plan insofar as such

documents and instruments are consistent with the provisions of the relevant subchapters of ERISA.

50. In the course of investigating and deciding Bennett's claim and appeal:

A. Guardian failed to act solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defray reasonable expenses of administering The Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, as much more full alleged in Paragraph 37.

B. Guardian failed to discharge its duties with respect to The Plan solely in the interest of participants and beneficiaries and for the exclusive purpose of providing benefits to the participants and their beneficiaries and defray any reasonable expenses of administering the plan with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims, as much more full alleged in Paragraph 37.

51. In the course of investigating and deciding Bennett's claim and appeal, Guardian engaged in acts and practices in violation of ERISA subchapter 1 as follows: Guardian failed and refused to provide a full and fair review as required because it did not comply with 29 C.F.R. §2560.503-1, as more fully alleged in Paragraph 37 herein.

52. Therefore, Guardian should be equitably precluded from relying upon, referencing, or providing to others, Dr. Boudreau's unreliable, not credible, and not supported by the facts December 16, 2021, Peer Review Report in future claims decisions involving Bennett's claim for LTD benefits under The Policy and should be ordered: TO NOTATE IN ITS CLAIM FILE CONCERNING BENNETT that Dr. Michelle Boudreau's December 16, 2021, report concerning Michel Bennett is: (1) unreliable, not credible and not supported by the facts because Guardian employees provided Dr. Boudreau with incomplete and misleading information on

which to base her opinion; (2) is not to be relied upon in future decisions or evaluations concerning Michel Bennett's claim for LTD benefits; (3) is not to be shared or disclosed with third parties; and (4) if subpoenaed by or required to be produced to third parties, including the Social Security Administration, this Note is to be attached to said report at the beginning and end of said report.

53. Bennett is informed and believes and thereon alleges that as a matter of custom and practice Guardian continues to engage in the acts and practices alleged in Paragraphs 47 - 50.

54. Bennett is potentially entitled to LTD benefits from Guardian until her normal Social Security Retirement age of 65. Unless Guardian is equitably precluded from engaging in the acts and practices described in Paragraphs 47 - 50, and unless Bennett is provided other appropriate equitable relief, as sought herein, Guardian will continue to engage in the acts and practices described in Paragraphs 47 – 50, with reference to Bennett's claim once her benefits are reinstated.

WHEREFORE, Plaintiff prays judgment as follows:

1. For declaratory judgment against Guardian ordering Guardian to pay to Bennett LTD benefits from April 30, 2021, and continuing until and unless she is determined to no longer be entitled to such benefits under The Policy.

2. For attorney's fees incurred in this action.

3. For costs of suit incurred herein.

4. For prejudgment interest on unpaid benefits.

5. For such other and further relief as the Court deems just and proper.

6. For declaratory judgment or other appropriate equitable relief pursuant to 29 U.S.C. §1132(a)(3), as requested in Paragraph 50 of this Complaint.

Dated: May 4, 2022

                             *s/ Robert J. Rosati*
                             ROBERT J. ROSATI,
                             Attorney for Plaintiff, Michel Bennett